**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
------------------------------------------------------------X
ABCON ASSOCIATES, INC.,

          Plaintiff,

               v.

HAAS & NAJARIAN and HAAS & NAJARIAN,
LLP,

          Defendants.
------------------------------------------------------------X

                            **ORDER**

                         CV 12-928 (LDW) (AKT)

**A. KATHLEEN TOMLINSON, Magistrate Judge:**

      Plaintiff Abcon Associates, Inc, ("Abcon" or "Plaintiff") brings this breach of contract

action to recover legal fees it paid to Defendants Haas & Najarian and Haas & Najarian LLP

(collectively, "H&N" or "Defendants") in connection with H&N's representation of Abcon in a

separate action against the United States Postal Service ("USPS"). Abcon claims that H&N

breached three legal services agreements and therefore should return the legal fees that were paid

in connection with those agreements.[1]

      H&N moves for an Order, pursuant to Federal Rule of Civil Procedure 37, sanctioning

Abcon for the alleged spoliation of evidence in the form of: (1) an adverse inference that

Abcon's liabilities exceeded the amounts sought to be recovered in this litigation; and

(2) monetary sanctions for the legal fees incurred in preparing for the February 12, 2013 hearing

and for the preparation of this motion. DE 75. Having reviewed the arguments advanced by

both parties in their written submissions, as well as the applicable case law, the Court hereby

DENIES Defendants' motion.

---

[1]     By Memorandum and Order dated July 16, 2013, Judge Wexler found that these three
documents constitute one agreement. DE 55 at 11.

I.    **RELEVANT BACKGROUND**

A.    **Roslyn Savings Bank/New York Community Bancorp, Inc. Loan**

In May 1996, Abcon was retained by the USPS for a construction project at a USPS processing facility in Queens, New York.  On or about December 31, 1997, the USPS terminated its contract with Abcon.  After the USPS terminated the contract, the United States Fidelity and Guaranty Company ("USF&G") paid claims in connection with various performance and payment bonds issued to Abcon and guaranteed by its president, Michael Zenobia, Jr. and his wife Theresa Zenobia (collectively, the "Zenobias").  After making those payments, USF&G commenced an action against Abcon, the Zenobias, and three related entities, as indemnitors under the bonds, and obtained a judgment in the amount of approximately $2 million (the "USF&G Judgment'").  In order to pay the USF&G Judgment, on March 12, 2002, the Zenobias and South Setauket Associates ("SSA") (an entity owned by Michael Zenobio which was not named under the USF&G Judgment) borrowed $2 million from Roslyn Savings Bank (now known as New York Community Bancorp, Inc. ("NYCB").[2]  This loan, referred to in the parties' papers as the NYCB loan, was secured by mortgages on the Zenobios' home and SSA's commercial property.  The repayment of this loan is at the center of the current dispute.

B.    **Abcon's Retention of H&N**

1.    *The Legal Services Agreement*

In April 1998, H&N was retained by Abcon in connection with the termination of Abcon's construction contract with USPS.  In July 1998, H&N filed a Complaint on Abcon's behalf against USPS in the United States Court of Federal Claims.  Abcon and H&N entered into

---

[2]    Although the Complaint alleges that Abcon was a borrower on the NYCB loan, Compl. ¶ 18, according to the parties' recent submissions, the only borrowers on this loan were the Zenobias and SSA.  *See* Pl.'s Pre-Trial Mem. of Law [DE 90] at 2, 6;  Defs.' Pre-Trial Mem. [DE 89] at 8.

a Legal Services Agreement ("LSA") on January 2, 2002 concerning H&N's outstanding legal fees in the amount of $183,489.60. Pursuant to the LSA, the parties agreed that H&N would retain a lien in any amounts recovered from USPS and that such lien would be subordinate to the lien securing NYCB's $2 million loan to "Abcon and certain of its principals to [NYCB]." Compl. Ex. A.

### 2. Abcon's Judgment Against USPS and the Filing of the Interpleader Action

Abcon obtained a judgment against USPS (the "USPS Judgment"), for which, on June 28, 2005, Abcon was awarded $2,405,150.32. In the interim, USPS received notice of various judgments and claims against Abcon and initiated an interpleader action in this Court (the "Interpleader Action"). USPS obtained leave of the Court and deposited the approximately $2.4 million with the Clerk of the Court (the "Interpleader Fund"). *United States of America v. Abcon Associates et al.*, 05-CV-3178 (LDW) (the "Interpleader Action").

### 3. The First Amendment to the LSA

In August 2005, Abcon and H&N executed a First Amendment to the LSA ("First Amendment"), which acknowledged that the funds from the USPS Judgment were the subject of the Interpleader Action and that $260,000 was owed to H&N, which fees were subject to a charging lien by H&N. *Id.* Ex. B. The First Amendment further acknowledged that H&N's charging lien was subordinate to "any and all sums owed by Abcon to [NYCB]." *Id.* It also stated that H&N would provide legal services to Abcon in an appeal to recover additional money from USPS and outlined how H&N would be paid from any money recovered by that appeal. By paragraph 6, the "parties reaffirm[ed] and reacknowledg[ed] the provisions of the LSA." *Id.*

### 4. The June 2007 Letter Agreement

In June 2007, Abcon and H&N executed a letter agreement, which by its terms

was to "serve as a modification to the First Amendment to the Legal Services Agreement." ("Letter Agreement"). *Id.* Ex. C. This letter, written by Louis Haas of H&N and agreed to and accepted by Michael Zenobia as President of Abcon, states that $263,000 was owed to H&N from the Interpleader Funds; the letter also describes how future monies received would be divided by Abcon, H&N and NYCB. *Id.* The Haas letter further states that "the above distribution agreement is contingent upon your [Abcon's] satisfaction with the resolution you are able to achieve with NYCB concerning the balance of Abcon's debt to NYCB as guaranteed and collateralized by you." *Id.*

### C. The Interpleader Action

In the Interpleader Action, motions were made addressing whether NYCB possessed a perfected security interest for the amount of the $2 million loan. By Order dated December 18, 2006, Judge Wexler found that NYCB had a priority perfected interest in the Interpleader Fund. On August 13, 2007, Judge Wexler entered an Order for the Distribution of the Interpleader Fund (the "Distribution Order"), pursuant to which various claims were paid, including $263,000 to H&N, with the remaining balance paid to NYCB, leaving insufficient funds to pay the remaining stakeholders. Thereafter, on December 15, 2008, Judge Wexler entered an Amended Order (1) directing further distribution of Interpleader Funds and (2) ordering distribution of an additional $200,000 to H&N and $655,416.60 to NYCB. At the time of the second distribution of the Interpleader Fund, Abcon was "satisfied" with the distribution resulting from Judge Wexler's December 15, 2008 Order because it "significantly reduced the amount of the NYCB Loan, and because Defendant again advised that additional monies should be forthcoming from the USPS Case which could be used to satisfy the balance of the NYCB." Compl. ¶ 49.[3]

---

[3] On April 29, 2009, there was an additional deposit into the Interpleader Fund in the amount of $47,014.95, which sum was eventually awarded to H&N.

One claimant, Goldberg & Connolly ("G&C") appealed to the Second Circuit, which on May 9, 2009, reversed and remanded, finding the NYCB's interest was unperfected and junior to G&C's interest. On June 30, 2009, a conference was held and Judge Wexler ordered NYCB to deposit back into Court the monies that it had received from the Interpleader Fund within two days. At that time, Abcon stated that it was no longer "satisfied" with the interpleader money paid to NYCB pursuant to its agreement with H&N and argued that H&N should therefore return the money H&N received from the Interpleader Fund, namely $463,000.00. H&N refused to do so.

After meeting that same day with Magistrate Judge Lindsay, all parties -- other than Abcon -- agreed to a settlement of the case, which was thereafter put on the record before Judge Wexler. Specifically, NYCB agreed to pay the $904,129.78 it received from the Interpleader Fund to the other claimants. Other than G&C, which recovered a bit more for taking and winning the appeal, all other claimants received a pro rata distribution. Abcon objected to the distribution on the record on the grounds that any amounts paid to H&N should have been subordinated to the monies paid to NYCB. Judge Wexler ruled that Abcon had no standing to object to the settlement since Abcon was not entitled to receive any of the funds at issue. *See* Tr. of June 30, 2009 Proceedings Before Hon. Leonard D. Wexler at 7, Case No. 05-CV-3178, attached as Ex. B to Mar. 3, 2014 Decl. of Jeffrey T. Strauss ("Strauss Decl."), DE 75-3.

> **D.      Plaintiff's Complaint and Judge Wexler's**
> **July 16, 2013 Memorandum and Order**
>
> > *1.      The Complaint and Defendants' Motion to Dismiss*

As originally filed, the Complaint asserted three breach of contract claims against H&N. In particular, Abcon claimed that the LSA, the First Amendment, and the Letter Agreement each

constituted a separate agreement between Abcon and H&N, and that H&N breached all three agreements by failing to subordinate its fees to the satisfaction of the $2,000,000 NYCB loan. H&N moved to dismiss the Complaint, claiming that these issues were already decided in the Interpleader Action and that Abcon was collaterally estopped from raising them again. Further, H&N argued that if there was a valid breach of contract claim, all three documents constituted one agreement, not three separate contracts. Finally, Defendants argued that since Abcon had no entitlement to any of the Interpleader Fund -- since all the claimants ultimately were paid less than their claims -- Abcon had not suffered any injury and, therefore, its breach of contract claims failed.

### 2.    *Judge Wexler's July 16, 2013 Memorandum and Order*

By Memorandum and Order dated July 16, 2013, Judge Wexler denied Defendants' motion to dismiss. Specifically, he found that Abcon was not collaterally estopped from claiming that H&N breached its agreement with Abcon because "the issue of the legal fees to which H&N was entitled under its agreements with Abcon was never fully litigated as required for the doctrine of collateral estoppel to apply." DE 55 at 9. He also found that the LSA, the First Amendment and the Letter Agreement constituted one agreement which gave rise to one breach of contract claim. *Id.* at 11.

Lastly, Judge Wexler found that Plaintiff had adequately alleged damages stemming from a breach of contract. In doing so, Judge Wexler rejected H&N's argument that Plaintiff's breach of contract claim must be dismissed because Abcon was unable to prove it had suffered any damages. In this regard, H&N argued that even if it returned the funds it had been paid to the Interpleader Fund, that money would go to Abcon's other creditors, not Abcon, and therefore

Abcon had not been damaged. Judge Wexler did not address this argument, instead finding that

the Complaint adequately alleged damages on another grounds:

> Abcon argues that the issue here is whether H&N breached its agreement to subordinate its entitlement to the Interpleader Funds to NYCB, and that Abcon has an interest in having that money paid to NYCB to settle those debt obligations. Specifically, Abcon claims the money still owed to NYCB incurs interest at a high default rate, and NYCB still has a lien on Plaintiff's assets. Thus, Abcon raises a valid claim concerning the nature of damage, if any, it has suffered as a result of H&N's alleged breach of contract. In light of the fact that this is a motion to dismiss, Plaintiff has plead enough facts "to state a claim for relief that is plausible on its face." *Bell Atlantic Com. v. Twombly*, 550 U.S. 544, 570 (2007).

*Id.* at 11-12.[4]

### E.    The Instant Motion

#### 1.    *The Document Requests at Issue*

H&N now seeks sanctions for Abcon's alleged spoliation of evidence. Specifically,

H&N asserts that Abcon spoliated evidence responsive to Request Nos. 31 and 33 of H&N's

First Set of Document Requests to Plaintiff, which were served on Abcon on July 19, 2012. The

Requests seek the following documents:

> 31. All documents concerning Abcon's outstanding liabilities as of June 30, 2009 in excess of the sum of $5,000 owed to Persons other than Roslyn Savings Bank, Kamco Supply Corp., Hi-Lume Corp., ARA Plumbing & Heating Corp., Goldberg & Connelly, Lovett & Silverman, St. Vincent's Catholic Medical Center, USF & G Co., and H&N.
>
> 33. Documents concerning Abcon's financial condition of June 30, 2009, including by way of specification but not limitation, a balance sheet and an accounts payable ledger.

Strauss Decl., Ex. G.

---

[4]    H&N contends that this theory of damages is no longer viable because the parties now know that Abcon was not a signatory on the NYCB loan. Of course, this is an issue to be resolved by Judge Wexler.

On or about September 20, 2012, Abcon responded to H&N's First Set of Document Requests, stating that it had no documents responsive to Requests Nos. 31 or 33. *Id.* Ex. H at 9. In addition to its specific response, Abcon asserted a general response that "some of the responsive documents may have been destroyed in the regular course of Plaintiff's business and/or by damage to a server from a power outage." *Id.* Ex. H at 1.

On November 13, 2012, H&N sent Abcon's counsel a deficiency notice outlining the deficiencies in the document production, including Abcon's failure to produce documents responsive to Document Requests 31 and 33. The parties thereafter met and conferred, and Abcon's counsel maintained that Abcon had no documents responsive to the relevant requests and that it was possible that some of the responsive documents were lost during the power outage incident. *Id.* ¶ 18.

On December 12, 2012, H&N filed a letter motion seeking an Order compelling Abcon's production of documents sufficient to identify its creditors as of June 30, 2009. DE 32. On December 26, 2012, Abcon's counsel responded to H&N's letter motion. DE 34. In response to the parties' letters, the Court issued an Order scheduling an evidentiary hearing for February 12, 2013 and directed "[P]laintiff's counsel to be prepared to present witnesses with knowledge of the underlying facts concerning the representations made regarding the lack of documentation and discarded records outlined in paragraphs 9-12 of [P]laintiff's opposition papers, and to address any other representations set forth in these paragraphs." Electronic Order, dated Jan. 4, 2013.

## 2. *The Evidentiary Hearing*

The Court conducted a hearing on February 12, 2013, and Abcon called as witnesses former employee Patricia Van Dusen as well as Eros Adragna, an employee of an Abcon affiliate

named Titan Realty and Construction, Tr. of Feb. 12, 2013 Proceedings ("Feb. 12, 2013 Tr."),
attached as Ex. L to the Straus Decl. The Court reviews the testimony of each witness below.

### a. Patricia Van Dusen

Ms. Van Dusen testified that she began working for Abcon in June of 1987, at its former
location in Plainview, New York. *Id.* at 6:19-23. She worked full-time for Abcon until March of
2002, when "[Abcon] was becoming inactive," meaning, "[Abcon] no longer was taking on new
jobs." *Id.* at 6:6-16. At that time, she performed work for Abcon on a part-time basis. *Id.* at
6:17-22. When she was hired, her title was "Director of Information Services" and her duties
consisted of looking for and finding construction jobs for which the company was to apply. *Id.*
at 7:17-21. After March of 2002, Van Dusen's title changed to Vice President of Risk
Management for Abcon Builders, an Abcon affiliate. *Id.* at 7:25-8:7. She still continued to work
part-time for Abcon on an as-needed basis. *Id.* at 8:8-11.

After Abcon became inactive, it moved its office to a smaller location in Greenvale, New
York in September 2009. *Id.* at 9:18-23; 10-3. In anticipation of the move to a smaller location,
Van Dusen was charged with "going through the files and selecting only those things that need to
be saved and destroying the rest." *Id.* at 10:3-15; 19:24-20:19. The only documents which were
moved and not destroyed were documents that were "legally required to be maintained." *Id.* at
21:1-3. In other words, Van Dusen researched on the Internet how long certain files had to be
maintained, *i.e.*, "personnel file that had to be kept X number of years, financial records were
prudent to be kept this long, income taxes, this long." *Id.* at 21:3-5. It was those "guideline[s]
that were used to reduce the files." *Id.* at 21:6-7. Van Dusen confirmed that any documents so
discarded were thrown away prior to the June 30, 2009 date in issue (the date of the settlement in
the Interpleader Action). *Id.* at 21:14-19.

Years later, when this action was commenced, Van Dusen was charged with helping to gather documents responsive to Defendants' document requests. *Id.* at 8:19-25; 10:16-22. Van Dusen testified that she personally searched through Plaintiff's remaining physical files for responsive documents but was not able to find any with respect to the two requests at issue. *Id.* at 13:5-24. Notwithstanding that fact, Van Dusen testified that a 2009 tax return was prepared for Abcon and that the 2009 file contained a balance sheet, a trial balance, and a profit & loss statement. *Id.* at 22:8-12. These documents were sent to the accountant to prepare Abcon's 2009 tax return, *id.* at 23:3-7, and though they were at one time available electronically on Abcon's QuickBooks program, they were no longer available in electronic format because of a server failure which wiped out all of the QuickBooks records, *id.* at 11:18-12:25; 24:18-25:19. In this regard, Van Dusen testified that the server had been damaged by viruses prior to the September 2009 move and she was unaware of any back-up that was installed. *Id.* at 29:7-14. In addition, after the move, there were a series of power outages in the new building; it was her understanding that this was the period of time when the computer "fried," but she could not pinpoint the exact date. *Id.* at 30:11-17.

Van Dusen further testified that she was not aware of any document retention policy during the period of time that she was employed by Abcon, *id.* at 15:17-23; 19:14-23, and she was not advised by counsel during 2009 to 2012 that there was a litigation hold on Abcon's financial documents, *id.* 16:25-17:17. In that regard, Van Dusen was not advised by counsel to backup Abcon's financial records in 2009 or in 2012. *Id.* at 16:18-24.

### b.     Eros Adragna

Eros Adragna testified that he was hired by Abcon Builders in 2008 as Director of Marketing and Sales. *Id.* at 35: 20-23. At the time he was hired, Abcon Builders was located in

Plainview, New York.  *Id.* at 35:22-25.  He became the "de facto IT person" at Abcon Builders

because he had a background in IT.  *Id.* at 36:1-8.  As part of his duties, Adragna began

upgrading the computer system.  *Id.* at 36:13-37:2.  The server which he worked on contained

Abcon's files as well.  *Id.* at 38:4-17.  When Abcon moved in 2009, Adragna was in charge of

moving the server that contained Abcon's files to the Greenvale office.  *Id.* at 39:7-12.  His

priority at that time was getting the business up and running at the new location, so he did not

focus on protecting data.  *Id.* at 53:3-10.

After Abcon moved to its new location in Greenvale -- in approximately October or

November of 2009 -- the Greenvale office experienced multiple power outages causing the

server to become corrupted.  *Id.* at 40:2-42:6.  The battery backups were insufficient to handle

the surges.  *Id.* at 40:23-25.  The other problem with Abcon's server, which Adragna detailed,

was that the server was outdated and therefore vulnerable to viruses because Microsoft stopped

releasing security updates for the operating system.  *Id.* at 41:17-23.  As a result, some of the

data on the server was lost, and Adragna started backing up as much data as he could.  *Id.* at 42.

He testified that in 2012, he was asked to search through the files that were saved for Abcon's

June 2009 QuickBooks files but was unable to locate them.  *Id.* at 47:2-23.  Adragna further

testified that at no time from 2009 to 2012 was he told that there was a litigation hold on

Abcon's financial records.  *Id.* at 48:14-49:9.

At the close of the hearing, the Court suggested that Abcon produce its year end

financials for 2008 and 2009 as well as its 2008 and 2009 tax returns.  *Id.* at 65-66.

### 3.    *Pre – and Post-Hearing Discovery*

By letter dated February 21, 2013, counsel for Abcon produced Abcon 's 2008 and 2009

tax returns.  Strauss Decl., Ex. M.  By letter dated April 2, 2013, counsel for Abcon provided

Abcon's 2010 tax returns, two pages of QuickBooks records from 2010, and the following three documents: (1) "Balance Sheet As of December 31, 2009" which reflects that it was printed on April 1, 2010 at 8:06 a.m.; (2) "Balance Sheet As of 12/31/09"; and (3) "Profit and Loss January through December 2009" which reflects that it was also printed on April 1, 2010 at 8:06 a.m. *Id.* Exs. N-Q. The "12/31/09" Balance Sheet reflects that at the start of 2009, Abcon owed "trade contractors" $747,130 but that at the end of 2009, Abcon owed nothing to these creditors. *Id.* Ex. P. The 2009 Abcon tax return reflects the same thing. *Id.* Ex. M. The balance sheet on the 2010 Abcon tax return is blank. *Id.* Ex. R.

According to H&N, and as detailed in the Strauss Declaration, during depositions, H&N was "unable to get any answers concerning the accuracy of these entries or obtain any source document which would support a conclusion that the $747,130 was a correct figure and, more importantly, that these creditors had all been paid as of December 31, 2009 (because a zero balance was reflected at year end)." *Id.* ¶ 26. For example, Defendants deposed Charles Farmer, the individual who prepared Abcon's draft tax returns. Farmer testified that he deleted or threw out all of the data that was sent to him to prepare the draft returns, Strauss Decl., Ex. T at 9:16-25, and that it was Cris Zenobio, Michael Zenobio's son, "who knows all the accounting," *id.* at 21:20-22:8. Defendants then deposed Cris Zenobio, who testified that he did not know how the $747,130 figure was reduced to zero at the end of 2009. *Id.*, Ex. U at 46:22-47:13.

### 4. *The Relief Sought*

In thid motion, H&N seeks sanctions under Rule 37 for Abcon's alleged spoliation of documents responsive to Requests Nos. 31 and 33. Specifically, H&N seeks an adverse inference that Abcon's liabilities exceeded the amounts sought to be recovered in this litigation.

H&N also seeks monetary sanctions for the legal fees incurred in preparing for both the evidentiary hearing and this motion.  DE 75.

## II.     DISCUSSION

### A.     Legal Standard

"Spoliation is the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation." *West v. Goodyear Tire & Rubber Co*., 167 F.3d 776, 779 (2d Cir. 1999); *accord Byrnie v. Town of Cromwell*, 243 F.3d 93, 107 (2d Cir. 2001).  A court may impose sanctions against a party who spoliates evidence pursuant to Rule 37(b) of the Federal Rules of Civil Procedure as well as through the Court's inherent powers to control the judicial process and the litigation before it. *See Residential Funding Corp. v. DeGeorge Fin. Corp*., 306 F.3d 99, 106-07 (2d Cir. 2002); *West*, 167 F.3d at 779.  In situations where sanctions are warranted, district courts have broad discretion in "crafting an appropriate sanction for spoliation."  *West*, 167 F.3d at 779; *see Fujitsu Ltd. v. Fed. Express Corp*., 247 F.3d 423, 436 (2d Cir. 2001) ("The determination of an appropriate sanction for spoliation, if any, is confined to the sound discretion of the trial judge . . . ."); *Reilly v. Natwest Mkts. Grp. Inc*., 181 F.3d 253, 267 (2d Cir. 1999) ("Whether exercising its inherent power, or acting pursuant to Rule 37, a district court has wide discretion in sanctioning a party for discovery abuses.").  The applicable sanction "should be molded to serve the prophylactic, punitive, and remedial rationales underlying the spoliation doctrine."  *West*, 167 F.3d 779.  Stated another way, the selected sanction should be designed to "(1) deter parties from engaging in spoliation; (2) place the risk of an erroneous judgment on the party who wrongfully created the risk; and (3) restore the prejudiced party to the same position he would have been in absent the wrongful destruction of evidence by the opposing party."  *Id*. (internal

quotation marks omitted); *accord Chin v. Port Auth. of New York & New Jersey*, 685 F.3d 135, 162 (2d Cir. 2012).

In some instances, the spoliation of evidence "can support an inference that the evidence would have been unfavorable to the party responsible for its destruction." *Zubulake v. UBS Warburg LLC*, 229 F.R.D. 422, 430 (S.D.N.Y. 2004) ("*Zubulake V*") (quoting *Kronisch v. United States*, 150 F.3d 112, 126 (2d Cir. 1998)). A sanction in the form of an adverse inference instruction is, however, "an extreme sanction and should not be imposed lightly." *Treppel v. Biovail Corp.*, 249 F.R.D. 111, 120 (S.D.N.Y. 2008); *see Zubulake v. UBS Warburg LLC*, 220 F.R.D. 212, 219 (S.D.N.Y. 2003) ("*Zubulake IV*") ("In practice, an adverse inference instruction often ends litigation - it is too difficult a hurdle for the spoliator to overcome.").

A party seeking sanctions has the burden of establishing "(1) that the party having control over the evidence had an obligation to preserve it at the time it was destroyed; (2) that the records were destroyed with a 'culpable state of mind'; and (3) that the destroyed evidence was 'relevant' to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense." *Residential Funding Corp.*, 306 F.3d at 107 (citing *Byrnie*, 243 F.3d at 107-12); *accord Centrifugal Force, Inc. v. Softnet Commc'n, Inc.*, 783 F. Supp. 2d 736, 741 (S.D.N.Y. 2011); *Zubulake V*, 229 F.R.D. at 430.

**B.    Analysis**

*1.    Duty to Preserve*

The first element a party must show when seeking sanctions for the destruction of evidence is "that the party having control over the evidence had an obligation to preserve it at the time it was destroyed." *Chin*, 685 F.3d at 162; *Residential Funding Corp.*, 306 F.3d at 107. The Second Circuit has determined that "[t]he obligation to preserve evidence arises when the party

has notice that the evidence is relevant to litigation or when a party should have known that the evidence may be relevant to future litigation." *Fujitsu*, 247 F.3d at 436 (citing *Kronisch*, 150 F.3d at 126). Pursuant to this obligation, "anyone who anticipates being a party or is a party to a lawsuit must not destroy unique, relevant evidence that might be useful to an adversary." *Zubulake IV*, 220 F.R.D. at 217; *accord Curcio v. Roosevelt Union Free Sch. Dist.*, 283 F.R.D. 102, 108 (E.D.N.Y. 2012). "In this respect, 'relevance' means relevance for purposes of discovery, which is 'an extremely broad concept.'" *Orbit One Commc'ns, Inc.*, 271 F.R.D. at 436 (quoting *Condit v. Dunne*, 225 F.R.D. 100, 105 (S.D.N.Y. 2004)). Therefore, "[w]hile a litigant is under no duty to keep or retain every document in its possession[,] it is under a duty to preserve what it knows, or reasonably should know, is relevant in the action, is reasonably calculated to lead to the discovery of admissible evidence, is reasonably likely to be requested during discovery and/or is the subject of a pending discovery request." *Zubulake IV*, 220 F.R.D. at 217 (internal quotations and alterations omitted); *see Scalera v. Electrograph Sys., Inc.*, 262 F.R.D. 162, 171 (E.D.N.Y. 2009).

The duty to preserve arises, not when litigation is certain, but rather when it is "reasonably foreseeable." *Byrnie*, 243 F.3d at 107; *see F.D.I.C. v. Malik*, No. 09 Civ. 4805, 2012 WL 1019978, at *1 n.1 (E.D.N.Y. Mar. 26, 2012) (holding that duty to preserve arose when attorneys who allegedly destroyed documents represented the plaintiff in the underlying transaction at issue); *In re Semrow*, No. 03 Civ. 1142, 2011 WL 1304448, at *3 (D. Conn. Mar. 31, 2011) (holding that duty to preserve vessel arose prior to commencement of suit because the fact that fatalities occurred should have put party on notice of future litigation); *Siani v. State Univ. of New York at Farmingdale*, No. 09 Civ. 407, 2010 WL 3170664, at *6 (E.D.N.Y. Aug. 10, 2010) (holding that receipt of letter informing defendants of alleged discrimination and

intent to pursue claim triggered duty to preserve); *Creative Res. Gr. of New Jersey, Inc. v. Creative Res. Grp.*, 212 F.R.D. 94, 106 (E.D.N.Y. 2002) (concluding that the duty to preserve arose months prior to the commencement of the lawsuit when the problems that eventually led to the filing of the lawsuit first surfaced).

Here, the Court agrees with H&N that Abcon's duty to preserve arose on June 30, 2009 when Abcon's counsel objected on the record to the proposed settlement of the Interpleader. At that time, all of the other parties agreed that H&N would retain the $463,000 that had previously been distributed to it in accordance with Judge Wexler's earlier Distribution. Abcon's counsel objected to the proposed settlement on the grounds that H&N's lien was subordinate to the NYCB loan. Strauss Decl., Ex. B at 7. This objection ultimately formed the basis of the instant lawsuit. The fact that Abcon waited over two years to commence this action does not change the fact that this suit was reasonably foreseeable at that time. *See In re Vitamin C Antitrust Litig.*, No. 05 Civ. 453, 2013 WL 504257, at *9 (E.D.N.Y. Feb. 8, 2013) ("[T]he law is clear that the obligation to preserve evidence arises when the party has notice that the evidence is relevant to litigation, and that this obligation may arise prior to the filing of a suit if the litigation is reasonably anticipated.") (citation and internal quotation marks omitted).

Having found that Abcon had a duty to preserve evidence as of June 2009 -- the date of the Interpleader Settlement -- the next question becomes what was the scope of that duty. As noted above, while a litigant need not retain every document in its possession, litigants are under a duty to preserve evidence that may be relevant to future litigation. *Fujitsu*, 247 F.3d at 436; *Zubulake IV*, 220 F.R.D. at 217. The requests at issue seek (1) all documents concerning Abcon's outstanding liabilities as of June 30, 2009 which exceed the sum of $5,000 owed to persons other than those who were parties to the prior Interpleader Action, and

(2) documents concerning Abcon's financial condition as of June 30, 2009, such as a balance

sheet and an accounts payable ledger. H&N argues that this information is relevant to its defense

of Abcon's breach of contract claim. Specifically, H&N states:

> The lost and destroyed documents that give rise to this motion are reflective of Abcon's creditors and amounts owed by Abcon as of June 30, 2009. H&N has maintained throughout this litigation that, even if it were not entitled to retain the funds that had been distributed to it pursuant to Judge Wexler's Distribution Orders in the Interpleader Action that it was agreed H&N would retain pursuant to the June 30, 2009 settlement, those funds would have been paid to Abcon's several other creditors who remained unpaid in full as of that date. If those funds were to be distributed to other creditors, Abcon's breach of contract claim must fail because Abcon would be unable to show that <u>it</u> suffered a pecuniary loss as a consequence of H&N's retention of the funds distributed to it. Stated otherwise, because of Abcon's straitened financial condition [as of] June 30, 2009, its liabilities well exceeded the amounts paid to H&N and so a refund of the monies paid to H&N would have resulted only in a shifting of funds among Abcon's creditors in partial payment of sums owed to such creditors by Abcon, <u>but no net monetary gain to Abcon</u>.
>
> . . . .
>
> This defense [i]s based upon H&N's knowledge that creditors paid in the Interpleader Action were all paid less than what they were owed; and H&N also understood that Abcon had other creditors at the time who were not parties to the Interpleader Action and that they too remained unpaid.

Defs.' Mem. [DE 75-25] at 1, 4 (emphasis in original). In support of this theory, H&N cites one

case, *Shred-It USA, Inc. v. Bartsher*, No. CV 02-4082, 2005 WL 2367613, at *8 (E.D.N.Y. Sept.

27, 2014), for the proposition that "proof of damages is an essential element of [a breach of

contract claim] under New York Law."

Plaintiff counters that information regarding its liabilities in June 2009 is irrelevant to this

action, which seeks to enforce the private subordination agreement contained within the legal

services contract between the parties. In this regard, Plaintiff argues that "[t]he only

creditors who could possibly have any relevance to this action are those that appeared in

the Interpleader Action, and their identities and the amount of each of their claims, paid and unpaid, is fully known." Pl.'s Mem. [DE 77] at 1. Plaintiff further contends:

> [H&N's] defense finds no support in either common or statutory law. If having creditors with claims potentially exceeding the amount sought in breach of contract was a viable defense, every breach of contract plaintiff would be subject to this defense. The books and records of every business or individual with a breach of contract claim would be open to discovery, and their claim potentially defeated. Taking defendants' position to its logical conclusion, a plaintiff suing on a note for a sum certain who has debts exceeding the amount of the note would be prevented from recovering, because any amount recovered might end up in the pockets of third party creditors. In any event, creditors' claims are also subject to various legal and factual defenses. Creditors often walk away from their claims or accept pennies on the dollar rather than litigate.

*Id.* at 4.

The Court agrees that H&N's defense is novel and not within the purview of the normal defenses to a breach of contract action. It is worth noting in this regard that H&N has cited no case law in support of this specific defense. Similarly, H&N has proffered no authority for the proposition that any money ultimately recovered by Plaintiff in this action would revert to creditors who appeared in the Interpleader Action and were not paid in full, much less to creditors who were not parties to the Interpleader Action. This defense is especially curious since the Interpleader Action is now closed. Thus, the Court finds that Plaintiff could not have reasonably anticipated that the documents sought may have been relevant to Plaintiff's future breach of contract case.[5]

---

[5] In any event, given the broad definition of relevancy for purposes of triggering the duty to preserve, the Court finds that even assuming the documents at issue were relevant for these purposes, H&N's motion would still fail since H&N cannot establish that the destroyed evidence was relevant for purposes of establishing the third element of the spoliation standard, discussed *infra*.

## 2.    *Culpable State of Mind*

"Even where the preservation obligation has been breached, sanctions will only be warranted if the party responsible for the loss had a sufficiently culpable state of mind." *In re WRT Energy Sec. Litig.*, 246 F.R.D. 185, 195 (S.D.N.Y. 2007); *see Residential Funding*, 306 F.3d at 107-08. Failures to preserve relevant evidence occur "'along a continuum of fault - ranging from innocence through the degrees of negligence to intentionality.'" *Reilly*, 181 F.3d at 267 (quoting *Welsh v. United States*, 844 F.2d 1239, 1246 (6th Cir. 1988)).  In this Circuit, "the 'culpable state of mind' factor is satisfied by a showing that the evidence was destroyed 'knowingly, even if without intent to breach a duty to preserve it, or negligently.'" *Residential Funding Corp.*, 306 F.3d at 108 (quoting *Byrnie*, 243 F.3d at 109) (internal alterations and emphasis omitted); *Curcio*, 283 F.R.D. at 111. "In the discovery context, negligence is a failure to conform to the standard of what a party must do to meet its obligation to participate meaningfully and fairly in the discovery phase of a judicial proceeding." *In re Pfizer Secs. Litig.*, 288 F.R.D.297, 2013 WL 76134, at *14 (S.D.N.Y. 2013) (internal quotations omitted); *accord Harkabi v. SanDisk Corp.*, 275 F.R.D. 414, 418-19 (S.D.N.Y. 2010)). A party is negligent even if the failure "results from a pure heart and an empty head." *In re Pfizer Secs. Litig.*, 2013 WL 76134, at *14; *Curcio*, 283 F.R.D. at 111.

Although the failure to institute a "litigation hold" is not gross negligence *per se*, whether the party implemented good document or evidence preservation practices is a factor which courts should consider.  *Chin*, 685 F.3d at 162; *see Orbit One Commc'ns, Inc. v. Numerex Corp.*, 271 F.R.D. 429, 441 (S.D.N.Y. 2010).  The Court notes further that "[t]he preservation obligation runs first to counsel, who has a duty to advise his client of the type of information potentially relevant to the lawsuit and of the necessity of preventing its destruction." *Orbit One Commc'ns*,

271 F.R.D. at 437 (quoting *In re NTL, Inc. Secs. Litig.*, 244 F.R.D. 179, 197-98 (S.D.N.Y. 2007)); *Neverson-Young v. BlackRock, Inc.*, No. 09 Civ. 6716, 2011 WL 3585961, at *3 (S.D.N.Y. Aug. 11, 2011) (finding plaintiff who donated her laptop "merely negligent" based on the fact that "[i]n contrast to corporate actors . . . [plaintiff] is unsophisticated and unaccustomed to the preservation requirements of litigation.").

Here, the evidence reveals that the documents at issue were either discarded during Abcon's move to Greenvale in September 2009 or lost due to server failure and/or corruption. While it is true that there is no indication in the record that Abcon instituted any sort of litigation hold, that is just one factor for the Court to consider. Moreover, although Defendants point to alleged inconsistencies in the witnesses' accounts regarding the timing and methods of the destruction, a fair reading of the record overall indicates that Abcon did not act in bad faith, especially given the marginal, at best, relevance of the documents at issue. Accordingly, the Court finds that Abcon's failure to preserve the documents was at most negligent.

### 3. *Relevance of Evidence*

Relevance may be assumed where the breaching party acted in bad faith or with gross negligence. *Neverson-Young*, 2011 WL 3585961 at *2; *Orbit One Comm'cns*, 271 F.R.D. at 441 (refusing to presume relevance where the evidence was merely destroyed due to the party's failure to abide by recommended preservation practices). However, where the spoliating party has acted only negligently, the moving party must make a showing that the lost materials were relevant. *In re Pfizer*, 2013 WL 76134, at *15; *Harkabi*, 275 F.R.D. at 419-20. "'[R]elevant' in this context means something more than sufficiently probative to satisfy Rule 401 of the Federal Rules of Evidence." *Residential Funding*, 306 F.3d at 108-09. "Rather, the party seeking an adverse inference must adduce sufficient evidence from which a reasonable trier of fact could

infer that the destroyed or unavailable evidence would have been of the nature alleged by the party affected by its destruction." *Id.* at 109 (internal alterations and quotation marks omitted); *see also Osberg v. Foot Locker, Inc.*, No. 07–cv–1358, 2014 WL 3767033, at *4 (noting that "'where the destruction was merely negligent,' plaintiff must also 'demonstrate that the destroyed evidence would have been favorable to' him, 'since in those cases it cannot be inferred from the conduct of the spoliator that the evidence would even have been harmful to him.'") (quoting *Zubulake*, 220 F.R.D. at 221).

Here, the Court has found that Abcon acted negligently at best and, thus, the Court cannot infer that the destroyed evidence was relevant. H&N must therefore demonstrate through extrinsic evidence, such as other existing documents or deposition testimony, that a reasonable jury could find that the missing documents would have been favorable to its claims. *See Curcio*, 283 F.R.D. at 113. H&N has not met this standard. As set forth above, no viable information has been presented that the allegedly despoiled evidence would have been favorable to H&N's claims. Instead, H&N's defense and the alleged relevancy of these documents appears purely speculative and conclusory. Accordingly, a request for an adverse inference must be denied. *See Treppel*, 249 F.R.D. at 12; *see also Simoes v. Target Corp.*, No. 11 CV 2032, 2013 WL 2948083, at *7 *E.D.N.Y. June 14, 2013) ("Because the present record does not satisfy the relevance element, plaintiff's motion for spoliation sanctions in the form of an adverse inference must fail."). Likewise, the Court declines to impose sanctions on the Plaintiff. The Court notes, however, that H&N is free to take up the issue with Judge Wexler at the time of trial whether it should be permitted to ask questions of witnesses as to what transpired with the documents, provided the H&N can proffer a good-faith basis for doing so.

**III.**    <u>C</u>ONCLUSION

For the foregoing reasons, Defendants' motion for the imposition of sanctions based on

spoliation is DENIED.

**SO ORDERED.**

Dated:  Central Islip, New York
          October 6, 2014

                                        <u>/s/ A. Kathleen Tomlinson</u>
                                        A. KATHLEEN TOMLINSON
                                        U.S. Magistrate Judge